Yes, Your Honor, Mrs. Hagee. May it please the Court, Counsel. My name is Stacey Hagee and I am appearing on behalf of the appellants in this matter. The state has the authority to tax the non-tribal members' use of goods and services purchased from businesses ancillary to a tribal casino. The Flandreau Santee Sioux Tribe has not met its burden to show preemption. Moreover, through the state's authority to regulate alcohol within its borders, the state may require licensed retailers to remit taxes incurred at that licensed business. The state imposes a use tax on the non-members' use of goods and services such as food, beverages, hotel rooms, and RV park hookups purchased at the casino's ancillary businesses. Pursuant to state law, the state denied three alcoholic beverage licenses issued to the tribe because the tribe was not collecting and remitting this use tax on these transactions. First, we look to whether the Indian Gaming Regulatory Act preempts either expressly or impliedly preempts the tax. If there's no agri-preemption, we then look to whether the tax unlawfully infringes on the right of reservation Indians to make their own laws and be ruled by them. This requires a review of the relevant federal, tribal, and state interests, which is also known as the Bracker Balancing Test. In this case, neither of these justify preemption. Now, AGRA regulates gaming, not ancillary businesses or amenities. The lower court found that the state taxation of amenities is preempted by AGRA  The error in this ruling is most evident in the context of alcohol. The lower court's decision that AGRA preempts the state tax on the members purchased alcohol and presumably all state regulation of alcohol at the casino and ancillary businesses directly conflicts with 18 U.S.C. 1161. But the taxes at issue are more than alcohol, correct? Correct, Your Honor. Did you divide those out for the district court to look at the alcohol taxes versus the taxes on the other amenities? It's a use tax on the purchase of services and goods. This use tax encompasses the use of alcohol. So it's the same tax being applied. It's just being applied to alcohol specifically as well as the other goods and services. It's the same use tax? Correct, Your Honor. Now 1161 was enacted in 1953 and recognized. So is your section 1861 argument that it was error not to carve out alcohol? No, Your Honor. Are you somehow saying 1861 wipes out the applicability of AGRA to the use tax in its entirety? And that's a bit of a stretch. So how do you get there? We believe in the context of alcohol that it shows the error in the court's ruling that alcohol as well as the other food and beverages are directly related to gaming. Specifically regarding alcohol, Congress would have needed to expressly preempt any alcohol regulation through AGRA, and it did not do so. There is no mention of alcohol or liquor in AGRA. And the lower court has seemingly gone where no court has gone before when ruling that AGRA preempts the state regulation of alcohol. While on the topic of alcohol, state law requires alcoholic beverage licensees to remit the taxes incurred as a result of the licensed business. The lower court invalidated this condition, failing to recognize the state's authority through 18 U.S.C. 1161. It is important to keep in mind that this condition applies to everyone and specifically relates to the taxes incurred at the licensed business. When you say applies to everyone, what do you mean? Everyone is required to pay the taxes associated with their licensed businesses. Now in the context of non-tribal retailers, it's the sales tax which would be imposed in that situation. In the context of tribal members or the tribe, it would be to collect the use tax incurred at the business from the non-members. The court errs in analyzing the condition under the collection burden perspective rather than 1161, and this is shown by the inconsistency created in the court's ruling. Applying the court's ruling, a state may regulate licensees to ensure that they are of good moral character, yet it cannot require the licensee to fulfill their legal obligation to collect and remit a non-member's use tax. So your main argument on that is that the district court conducted the improper analysis, that it's improper under 1161. Is that your position? Yes, Your Honor. The lower court failed to recognize the state's authority through 1161 to regulate licensees. So your position is that 1161 is broad enough to give the state the authority to link these two things, the remittance of the tax, and link that to approval of an alcohol license? Correct, Your Honor. The condition can be viewed as requiring what is already required by law in that tribes and tribal members collect and remit this use tax. It also creates a bifurcated system where the state may impose this condition on all licensees except on-reservation tribal retailers. Thus, as Rice v. Renner put it, on-reservation tribal retailers would be super-citizens free from this state alcoholic beverage regulation. Now going back to the remaining transactions and whether IGRA preempts the tax in that case, the lower court relied on IGRA section 2710d.4 to support preemption. 2710d.4 provides that IGRA does not confer upon the state any authority to impose its tax on a tribe or those authorized to engage in Class III gaming activities. Now, d.4 sets the boundaries of the state's tax implications in IGRA. Outside of the gaming proceeds, IGRA isn't taking away any of the state's authority that it already has. In this respect, IGRA is tax neutral. The lower court read 2710d.4 as prohibiting a state tax on the purchase of amenities by those who gamble. However, under that interpretation, d.4 could not apply or preempt taxes on those under 21 who are not even allowed to gamble. Section 9.2 of the Gaming Compact between the tribe and the state says no person under the age of 21 shall play or be allowed to play in any gaming device. Yet the court did not recognize that these individuals can't play games, and so therefore d.4 wouldn't cover. d.4 can only be read to preempt a state tax on the Class III gaming. It does not appear that any other court has interpreted d.4 to prohibit a tax outside of the play of games. This is supported by both 2710d.3c.3 and Ryankin, both which seem to provide exceptions to taxing gaming profits. Indeed, it would be illogical that IGRA would prohibit a tax on other activities at a casino, yet allow the state to have a chunk of the actual gaming proceeds. Well, you don't need IGRA to bar states from taxing the tribe directly, right? Excuse me, Your Honor? The state can't tax the tribes directly anyway. The tribe doesn't need IGRA for that, does it? That is absolutely correct, Your Honor. Here d.4 is being used. IGRA is even tax neutral as to that, as I understand your position, because as long as the casino is owned and operated by the tribe, it cannot be directly taxed. Absolutely, Your Honor. Next, IGRA does not impliedly preempt the use tax on the nonmembers because it does not involve the tribe's governance of gaming, which, according to this circuit in Dorsey and Whitney, is the key question. It is important to keep in mind the specific transaction that's being taxed here, the nontribal members' use of goods and services purchased at ancillary businesses. It again seems that no court has gone as broad as the lower court has in ruling that a state tax on these amenities is preempted by IGRA. Conversely, when analyzing IGRA's scope of preemption in the context of state taxation, courts have upheld the state tax on slot machines as well as construction materials used to build a casino. Here the district court said they were directly related, sort of almost didn't quite. I don't know if this district court went as far as a but-for analysis, but can you address that a bit? Absolutely, Your Honor. This court did apply a but-for test to say it's within the catch-all provision. It's a subject that is directly related to the operation of games. The court said that these transactions are directly related because but for the casino, the transactions at the ancillary businesses would not exist, and but for those businesses, the casino could not operate. The court inerred in adopting the but-for test from Coyote Valley to an out-of-circuit case, especially after the Department of Interior's indication that ancillary businesses do not fall within the catch-all provision. Is there any, in any of the Supreme Court cases, is there guidance on this issue, any hint that a but-for analysis is the appropriate one to take? No, Your Honor. That is not mentioned in any of the Supreme Court cases that I'm aware of. But we look to Dorsey & Whitney, which is controlling, and the but-for test produces a result which conflicts with the tribal governance of gaming test. The transactions at these ancillary businesses are indeed one step removed from the gaming. The Department of Interior has again recognized that these ancillary businesses don't fall within the provision. It recognizes, as the state argues, that a broad interpretation would harm tribes generally. States would be allowed to go in and compact and regulate on all sorts of different topics if this catch-all provision is opened up. Now, can you explain that a little more? What are the implications of state being able to compact about amenities? So 2710D3C sets out a list of subjects that both the state and the tribe can essentially bring to the table to negotiate on its gaming. I understand that. And I understand your argument that the district court's rationale would mean that these are compactable subjects, so to speak. I'm just asking about the real-world implications of that. You say that would harm the tribe. Why? Because the state could then bring to the table that it wants to regulate the tribe's operation of its restaurant. It wants to impose health and safety standards on the tribe. It would allow the state to bring that to the table without a possible bad-faith claim being brought against the state. So it essentially opens up the state to allow these subjects in to where the state could regulate the tribe's actions. You mean it could regulate the tribe in a way that's different from the way it regulates everybody else? Your position is they don't need to go through a compact. They can just impose the use tax directly on the non-tribal members, right? Correct, as to non-tribal members. You say if it were covered by the compact, then it could regulate the tribe and tribal members too. Correct. So generally speaking, a state would have no authority to go require the tribe to get its restaurant licensed, for example, under the state's Department of Health. But if the restaurant is included as a topic that's directly related to the operation of games, the state could then bring to the table that, hey, we want to regulate, we want to license your restaurant. What state has brought that to the table and gotten sued for it? None that I'm aware of, Your Honor. Why can't the state bring that to the table anyway? What's the average useful life of one of these compacting agreements? I get the sense in Minnesota it's almost permanent. Nothing's renegotiable. The tribe won everything the first time around. No, I believe under the state and the tribe's gaming compact, this lasts for five years, and the state does recognize that other compacts do have these terms in there. Which terms? Sometimes regulating these ancillary businesses. Some other states have compacted on those topics? Correct, Your Honor. You think that's contrary to the statute? I do, Your Honor, and I believe the Department of Interior's interpretations and approvals, disapprovals or approvals because they just allow them to go into effect, recognize that the Department of Interior doesn't necessarily view these as appropriate topics. They point out that these amenities, it goes beyond the compactable subjects, but rather than halt and put a stop to a tribe's casino and potentially harboring the tribe and the states where they've gotten to, the Department of Interior just allows them to go into effect to the extent they are consistent with IGRA. You mean leaving it open for litigation then if somebody wants to object? Correct, Your Honor. The Department of Interior has indicated that through limiting compactable subjects, Congress sought to establish boundaries to restrain aggression from powerful states. This is found in docket number 41-2. The state is respecting those boundaries, especially considering the Department of Interior's indication that these ancillary businesses are not an appropriate subject. Do you think Judge Pearsall did a bracker analysis in this case? And if not, is that something this court can do in the first instance? I do not believe the lower court did a bracker analysis in this case. I do believe this court could look at it at this level without remanding on that issue. The facts are essentially undisputed. This issue has been fully briefed to this court, and I think we can also no further look to the lower court's unappealed bracker analysis regarding the convenience store in this case.  As recognized by the lower court in that context, tribal sovereignty and tribal economic development are insufficient to bar the state tax. We can also look to the lower court's decision regarding overhead costs. Overhead costs were not enough to bar the state's imposition of this tax. The nonmembers on which this tax is imposed have no say in tribal affairs, or do they share any tribal disbursements? What, in your view, what was the logging case? Is that Rama or is it the other one with the bracker case? But the point being, I think, that the state makes is that the federal interest was more pervasive or whatever in logging than in gaming. Explain why. I suspect you're going to say, well, the gaming interest is just financial supportive and the logging interest was regulatory, but I don't see how that translates into a contrast. That's not quite, Your Honor. So in bracker, we're looking at regulation of the taxed activity. Here, the taxed activity is the nonmembers' use of these purchased goods and services. While IGRA regulates gaming and while there's a lot of federal regulations on the topic of gaming or gaming revenues, it does not regulate these transactions. The bracker analysis required a look at the federal interest, the tribe interest, and the state interest. So the federal interest is broader than how many drinks a nonmember has at the casino. And I think you can look at IGRA. IGRA does contain a statement regarding the promotion of tribal economic development through gaming, but this general reiteration of the federal Indian policy does not support that Congress intended to remove all barriers to a tribe's profit maximization as discussed in cotton petroleum. Your Honor, I'd like to reserve the rest of my time for rebuttal. Kitter? Good morning, Your Honors. If it pleases the Court, my name is Rebecca Kitter, and I'm here today on behalf of the Flandreau-Santee Sioux Tribe. With me today are Tribal President Anthony Reeder, Vice President Andrew Weston, members of the Executive Committee Kenneth Weston and David Kills 100. You know, Your Honors, the Indian Gaming Regulatory Act was passed in October of 1988 by Congress. It has had a tremendous impact on the lives of tribal members living in their homelands across this nation. Class III gaming casinos have, as this Court has recognized, often meant the difference between an adequate governmental program and a skeletal program that is totally dependent on federal funding. That was this Court's holding in City of Duluth v. Fond du Lac. There, the Court, and in the Dorsey-Whitney case recognized, IGRA has extraordinary preemptive effect. It preempts the field. Well, I don't understand how you get from point one to point two. Right. I don't understand how the success of this demands a legal conclusion that has massive preemptive effect. It's this Court's holding. That's very atypical, if not inappropriate, preemption analysis. In the Court's decisions in Marty Indian School v. South Dakota on the Indian Self-Determination Act, and in this Court's view of the Indian Gaming Regulatory Act, it is intended to be preemptive of the entire field. And that is based on the- Well, it depends what the field is, though. What do you mean by the field? Right. And so the field- If the field is the operation of gaming activity, what is that? How broad is that, right? Right. And that is the question here. Did Congress, when it passed the law, intend to say we're only regulating the play of game? The Supreme Court has identified it recently, right, the gaming as the rolling of the dice and the actual gaming. In Bay Mills, that was about whether the gaming was on tribal land or not, and it was protective of tribal sovereign immunity. And what Kagan actually said is Class III gaming is- You mean Justice Kagan? Justice Kagan. I apologize, Your Honor. What she said is it's what goes on in a casino, dash, the spin of the wheel, the roll of the dice. So it isn't about what is class- That case dealt with whether it was on tribal land, and it dealt with what a Class III gaming activity was. This case is about the scope of 2710D3C7.  And the Ninth Circuit case in Coyote Valley II, which is a cert denied case, goes through and explains why IGRA was broader than the regulation of the play of game. Congress knew when it passed the Indian Gaming Regulatory Act that it was about giving tribes an equal playing field to enter Class III gaming operations. Class III, by definition, is complex gaming. It's high-lie, it's paramutual betting, and it's casinos, Vegas-style. The Senate report, which is cited in Coyote Valley II, actually explains that Congress said specifically that. Our intention is to give tribes an equal playing field when it comes to these complex gaming operations so that they can have economic development. That was the whole intent of the statute, and to have them be free from state regulation unless they compacted for it with the state. So what, then, is the standard for determining whether amenities are directly related to the gaming operation? How do you determine that? Obviously, you're saying in this case, it's what we've got here, everything but the convenience store. How do you define it for the future? What is the limit of directly related? Sure, and I think that Judge Pearsall's reliance on the Coyote Valley II is appropriate. It's a two-way test. The first direction is, can that amenity exist or would it exist without the operation of gaming? The second part of the test is, would the gaming revenue be impacted dramatically by not having that amenity? This is not a Forest County, Pottawatomie case where you had a casino across the street, off the reservation, totally separate from the casino. All of these amenities are in the licensed facility. The facility is licensed under the National Indian Gaming Commission, and the Tribal Gaming Ordinance is the Flandreau-Santee Sioux Tribal Casino. All of these areas are regulated. They're subject to the Bank Secrecy Act regulations in terms of the movement of money. They're subject to the comping regulations on who can comp. When you say the facility, can you help me understand what you mean by that? They are all within the facility. What do you mean by that? They are within the facility licensed under the Indian Gaming Regulatory Act as a gaming operation. So facility, are you describing this as buildings? Are you describing this as a piece of land where whatever we put on that piece of land, what is licensed here, just for my understanding? The Indian Gaming Regulatory Act and the National Indian Gaming Commission require that they be licensed building by building. Every separate building has to have a license to be able to game there. It is the Royal River Casino building that has the license from the National Indian Gaming Commission and the Tribal Gaming Commission. In that building, we have alcohol at the bar, which is served on the gaming floor. We have food, which also can be served on the gaming floor. We have the hotel, we have the gift shop, and we have live entertainment. It is not like we have eight buildings and we're saying, oh, the building half a mile down the road is subject to the Indian Gaming Regulatory Act. They are all part of the same envelope. There is extensive information in the record how interrelated they are. And this is not the tribe manipulating it to make it so. It is industry standard that if you do not have these amenities, you are not going to get gaming revenue. In this case, the record is very clear. Larchwood, Iowa, is a huge gaming facility. And when it moved in, it took a lot of the revenue that this casino had. If this casino didn't have these amenities, they wouldn't be making any money. In addition, these are what they call in the industry loss leaders, meaning that these amenities are not there to make money. They are there to encourage customers to stay and play and to gain new customers. They don't make any money. We actually lose a million dollars at that restaurant every year. But that's okay because its existence is there to support the gaming and to make the customers gain. You talked about a competitor impact, but fill me in on that. What competitor, where, and when? There is a casino that moved in in Larchwood, Iowa, right down the road, and they had more machines allowed than the Flanders Casino was allowed at the time by the state of South Dakota. And they have a lot of amenities, golf course, spa, restaurants, and the rest. They are about equidistant from Sioux Falls, and they took a lot of the revenue. So this tribe has had to do... They're fully taxed by the state. They're taxed by the state of Iowa. This casino is not tax-exempt. The tribe charges a 6% sales tax to its consumers. The state wants to add another 4.5%. Leaving the tribe with a very difficult decision, Hobbesian, in fact, either forego $350,000 about in taxes that are generated, 90% of their taxes are generated from the casino, and impose the state tax or raise the price of those things that the customers want, the alcohol that they buy while they game, the food that they eat while they're doing that, and thereby decrease the gaming revenue, decrease the number of customers. The record is very clear that these are complementary in an economic sense. These amenities, when you increase the price of an amenity, you're going to decrease the consumption of gaming, play of games. I do want to, Your Honors, focus on the fact that the Indian Gaming Regulatory Act doesn't just regulate the play of Class III games. We feel that Judge Pearsall got it right, that you have to ignore the entire structure of the Indian Gaming Regulatory Act to buy the state's argument. 27022 is- Does the UGRA legislative history address state taxation other than directly taxing the casinos? It actually does, and we believe that the language does by saying you can't tax. You cannot tax these facilities, these Class III facilities at all, unless you compact for it and you are giving a benefit in exchange for the burden. Now, I asked you about legislative history, and you made it sound like you were quoting the statute, and I don't think the statute says what you just argued, so I'm not sure where you're- Sure, I'll do both. I'll go first to the parts of the history. Does legislative history say that we wouldn't want the states to impose the same taxes on amenities as non-Indian competitors would pay the states otherwise because that would get in the way of the state collecting a large sales tax in addition to pocketing the casino profit? So I'm going to read to you the parts of the committee report that address this issue of taxation. I'm excited. I mean, we were short of time, but- Yeah, I mean, we have ten minutes. Is it in your brief? It is in the brief, and the committee did say nothing in this section shall be construed as conferring upon a state or political subdivision's authority to impose any tax fee, charge, or other assessment upon the tribe or any other person authorized to engage in Class III gaming, and that is the statute. It says that at 2710 D3C3. But you've presented this as sort of a modeling on Vegas-style gambling, right? Yes. Where there's the gambling, the amenities, they're all wrapped up together. Yes. One, I'm assuming that the Vegas-style gambling model, business model, is what you've described, which is you make the money from the gambling and the amenities are there to support it, bring in the people. Is that- That's absolutely correct, and that's on the record. So going to the history again, the history of the act, is there any discussion of that sort of an analogy between Vegas-style gambling and what's in IGRA and the goal of Congress to sort of equate those in a way that would support your argument? Yes, and actually Coyote Valley, too, has the actual language. That case has the language in Senate Report 100-446. The Senate report was very clear that the exclusive mechanism to balance state and tribal interests in Class III gaming operations, such as the casino at issue, they concluded that the use of compacts between tribes and states is the best mechanism to assure that the interests of both sovereign entities are met with the respect to regulation of complex gaming enterprises. They also describe in the report that the seven topics you can compact on listed in the statute says it does not intend that the compacts be a subterfuge for imposing state jurisdiction on tribal lands. Gaming by its very nature is a unique form of economic enterprise, and the committee is strongly opposed to the application of jurisdictional elections authorized by this bill to any other economic or regulatory issue. So I don't hear any direct analogy between the business models. In other words, a direct reference to this is what we're thinking. Is that fair? They reference the Fort Mojave Compact, actually, which is a compact with the state of Nevada. And that particular reference is on page 13 of the committee report in West Ludbe, page 3083. The Fort Mojave Compact, actually, the tribe in the state of Nevada negotiated to impose all state civil and criminal jurisdiction except for taxing because the tribe didn't want it. And IGRA does allow states and tribes to negotiate. The concern of Congress was that tribes be able to negotiate on an even playing field. So your position is that the state could regulate through a compact the hotel, restaurant, and so forth that are associated with the casino? If the tribes agreed to it. Just because it's one of the seven compactable areas that Congress set out doesn't mean that a tribe has to agree to it. It isn't a situation where the state says, I want it, and the tribe has to agree to it. The opposite is true. Cabazon was the Supreme Court opinion beforehand. On how much bargaining power. That's right. Tribes under Cabazon, the Supreme Court opinion before they passed IGRA, said this is purely tribal jurisdiction over gaming. There is no role for the state. Do you agree with the state that the Department of Interior has expressed concern about reading the catch-all too broadly because it would give states authority to negotiate over amenities and things outside of the gaming itself? We absolutely disagree. Kevin Washburn was speaking for himself.  His concern was about the amenities within the compacting process causing a problem of not being able to win a bad faith case against the state. The Senate report on the Indian Gaming Regulatory Act and Interior have been clear as well as the courts. The only role for the state is through the compacting process. Here what the state is saying is we can tax this casino out of existence as long as we put the incidence of the tax on a consumer of everything but the pulling the slot machine. And that will have a huge impact on tribes. Instead, we think it's clear in the legislative history that what Congress intended is South Dakota, if you're doing something that benefits that casino under 2710D3C3, you can demonstrate in the compacting process that you are giving a benefit for the burden you want to impose and that it's not bad faith for you to make that a condition of this compact. That's the process. That's not what South Dakota did here. South Dakota said, I don't have to listen to the Indian Gaming Regulatory Act. We want to impose this use tax. We know we can't tax the tribe, so we're just going to tax the use of what the tribe sells you the minute after you buy it. And if you don't pay it, we're yanking your liquor license. And I'd like to, you're running out of time, and I'd like you to address, if you might, the state's argument about its ability to condition the renewal of the alcohol licenses on the tribe's remittance of the use tax. First, do you agree with the assessment that it was analyzed improperly at the district court? Is it an 1161 issue? I think the state's characterization is incorrect and that the judge got it absolutely right. 18 U.S.C. 1151 gives the state pre-existing, pre-IGRA jurisdiction to regulate alcohol. Rice v. Rainer is the Supreme Court opinion that makes very clear why. It's so that you don't have a spillover effect into the state of unregulated alcohol in Indian Country. Here, this use tax has nothing to do with the regulation of alcohol flow. This use tax has nothing to do with an alcohol tax. The tribe pays the alcohol tax to the state of South Dakota through its wholesalers. It's imposed upstream. This tax in the South Dakota law in dispute only applies to Indian tribes and their members. We're the only ones required to collect that use tax, which is somebody else's tax, according to the state, that we have to collect for them. And that is well beyond the scope of their police power to regulate alcohol. So your argument is that that licensing requirement is just simply invalid? Absolutely. So is that your burden? Is that the tribe's burden to show the invalidity of that requirement? I don't believe so, Your Honor, because the state is the one wanting to impose that on the tribe. We start the playing field with this is tribal regulation. This area of tax is not clearly belonging to the tribe. Squaxin Island is a very helpful case in this respect because there the court said, look, you can impose an alcohol tax that's used, the revenues used to regulate alcohol. But we're not sure if this wasn't an alcohol tax if you could impose it. It's beyond your scope. So when you bring the claim that it's invalid and you think then that shifts the burden to the state to prove that it's invalid? I think it shifts the burden to them to prove it's also reasonably necessary to the exercise of their police power. That's the Milham Atiyah case in cigarette taxing where the court said, you've got to prove the enforcement mechanism you're trying to do has some reasonable relationship to the power you're trying to enforce. I think it's really important here. This casino's never had an alcohol violation. They're squeaky clean. The state agrees with that. They regulate alcohol well. And we have certainly never suggested that because Indian Gaming Regulatory Act preempts taxes, right, use taxes, that somehow we don't have to abide by your preexisting authority to regulate alcohol along with the tribe. We think, Your Honors, it's really important here to notice the state doesn't do anything for this casino that it isn't reimbursed for. This tax is not going anywhere but in the general fund of the state. This state has no government buildings on this reservation. They don't do the roads. They don't do any of these things for those patrons gaming in our casino. The tribe funds it because this tribe has been successful under the Indian Gaming Regulatory Act. I think the additional views of the late Senator John McCain are instructive in the Senate report. He said the state and the gaming industry have always come to the table with the position that what is theirs is theirs and what the tribes have is negotiable. I believe it's important to underscore that statement that appears on page 10 of the report. The committee does not intend to authorize any wholesale transfer of jurisdiction from tribe to a state. That is the key. This tribe deserves to compete on equal footing with other casinos, not be subject to a double tax. It deserves to be the primary economic beneficiary. This court in Fond du Lac made clear we don't care if you call a $6 million fee on a tribal casino a rent. If it does not bear a relationship to the services you're providing as provided for in the compact under C-3, you can't impose that. You're not allowed to do that. That is preempted. We think that's also the holding of Marty Indian School v. South Dakota. There are a few statutes that are this broad, and in this court recognized in the Dorsey and Whitney cases, it's so broad it's one of a handful of federal statutes that's completely preemptive of state jurisdiction in court. It is that broad. So we thank you, Your Honors, and we appreciate your consideration of the case. Thank you. Court of audit. Your Honors, the tribe keeps going back to how IGRA regulates gaming facilities, but that's how the tribe defines it. The tribe wants to define its facility as anything connected, but not even that because in the context of the RV park, the RV park is not physically connected to the casino. This shifts the focus back to the casino rather than gaming, which is what IGRA is regulating. Regarding amenities, Kevin Washburn's article describes it best. These amenities are not part of IGRA. They are not subjects directly related to the gaming. And while Washburn was not acting under his authority as Assistant Secretary of the Department of Interior while writing that article, he does cite to several Department of Interior official letters with that same position. And it was also recognized by the district court in Washington, D.C., recently in the case of Forest County Potawatomi. The tribe also wants to talk about the complementarity, which is essentially the but-for test. But that, again, especially its application here, goes against Dorsey and Whitney's question that IGRA preempts the tribe's governance of gaming. IGRA's legislative history does address taxation. It says the states can't compact on taxation. Also regarding 1161, the tribe has a legal obligation to collect this tax. The condition narrows that to taxes incurred at the licensed business. 1161 allows the states to do this. So you have 20 seconds left. In closing, the lower court's decision goes against the interests of tribes generally. Interpreting the catch-all provision broadly to preempt states' jurisdiction over non-members increases the subjects that the state can regulate the tribes on. The state requests reversal in that these subjects are not compactable, and the state may tax them. Thank you, Your Honors. Thank you, Counsel. The case has been thoroughly briefed and very well argued and raises difficult, important questions. We'll take it under advisement. Let's call the next case. The next case is 182750, South Dakota, Flandreau-Santee Sioux Tribe, B. Richard Satgast, et al. Thank you.